**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Raymond T. BRITTAIN,**
**Defendant–Appellant.**

No. 90–6202.

United States Court of Appeals,
Tenth Circuit.

April 30, 1991.

Edward J. Shawaker, Dept. of Justice, Environment and Natural Resources Div., Washington, D.C. (Richard B. Stewart, Asst. Atty. Gen., Washington, D.C., Timothy D. Leonard, U.S. Atty., Leslie M. Kaestner, Asst. U.S. Atty., Oklahoma City, Okl., Robert L. Klarquist, Dept. of Justice, Environment and Natural Resources Div., Washington, D.C., Kathleen A. Hughes, Special Asst. U.S. Atty., Oklahoma City, Okl., with him on brief), for plaintiff-appellee.

William J. Skepnek of Stevens, Brand, Lungstrum, Golden & Winter, Lawrence, Kan. (Thomas G. Blakley of Blakley, Henneke & Maxey, Enid, Okl., Steven L. Tolson of Hall, Estill, Hardwick, Gable, Golden & Nelson, Oklahoma City, Okl., with him on brief), for defendant-appellant.

Before ANDERSON, BALDOCK and BRORBY, Circuit Judges.

BALDOCK, Circuit Judge.

A jury convicted defendant-appellant, Raymond T. Brittain, of eighteen felony counts of falsely reporting a material fact to a government agency, 18 U.S.C. § 1001, and two misdemeanor counts of discharging pollutants into the waters of the United States in violation of §§ 301(a) & 309(c)(1) of the Federal Water Pollution Control Act of 1972 (Clean Water Act), codified at 33 U.S.C. §§ 1311(a) & 1319(c)(1). Defendant appeals, contending: (1) the government did not establish materiality as required by 18 U.S.C. § 1001; (2) he is not a "person" who discharged pollutants as contemplated by the Clean Water Act; and (3) the evidence is insufficient to prove that he discharged pollutants in violation of the Clean Water Act. We affirm.

I.

We first consider materiality under 18 U.S.C. § 1001. The Clean Water Act prohibits the discharge of pollutants from any point source into the navigable waters of the United States unless such discharge complies with a permit issued by the EPA pursuant to the National Pollutant Discharge Elimination System (NPDES) or by

an EPA authorized state agency. *See* 33 U.S.C. §§ 1311(a) & 1342. NPDES permits impose limits on the point sources and amounts of discharged pollutants, and the EPA monitors compliance through monthly discharge monitoring reports from the permittee. *See generally* 33 U.S.C. § 1342 (NPDES system); 40 C.F.R. § 122 (1989) (NPDES regulations). Defendant, as public utilities director for the city of Enid, Oklahoma, had general supervisory authority over the operations of the Enid wastewater treatment plant and was responsible for filing the plant's discharge monitoring reports. Defendant directed the plant supervisor to falsify eighteen monthly discharge monitoring reports and the supporting laboratory records by recording 25 to 30 milligrams per liter of effluent for two specific pollutants regardless of the actual measurements at the point of discharge. Rec. vol. VII at 501–02. Defendant's convictions under 18 U.S.C. § 1001 resulted from these falsifications.

Section 1001 prohibits any person from knowingly and willfully making a false statement regarding a material fact that is within the jurisdiction of a federal agency. *See United States v. Irwin*, 654 F.2d 671, 675–76 (10th Cir.1981), *cert. denied*, 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982). Defendant concedes sufficient evidence on all of the elements of § 1001 except materiality. Therefore, we limit our discussion to whether defendant's false statements were of a material fact, a separate and distinct element of the offense.[1] Although materiality remains an essential element of the § 1001 offense, we recently overruled our past decisions and determined that materiality is a question of law to be reviewed de novo. *See United States v. Daily*, 921 F.2d 994, 1004–06 (10th Cir.1990) (citing *Kungys v. United States*, 485 U.S. 759, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988) (Supreme Court ruled that materiality under 8 U.S.C. § 1451(a) is a question of law)).

A false statement is material if it " 'has a natural tendency to influence, or [is] capable of influencing, the decision of the tribunal in making a determination required to be made.' " *Gonzales v. United States*, 286 F.2d 118, 122 (10th Cir.1960) (quoting *Weinstock v. United States*, 231 F.2d 699, 701–02 (D.C.Cir.1956)), *cert. denied*, 365 U.S. 878, 81 S.Ct. 1028, 6 L.Ed.2d 190 (1961). *See also Irwin*, 654 F.2d at 677. Defendant contends that the government did not establish materiality because it did not demonstrate that his false statements were capable of influencing government action. He relies on a plant laboratory technician's personal diary offered by the government. The diary reflected the true levels of pollutant discharge to be below the falsely reported levels and within the plant's NPDES permit limits. Defendant also urges us to consider the testimony of Sharon Parrish, an expert witness for the government. Ms. Parrish testified that an EPA enforcement action would result if the discharge monitoring reports reflected pollutant discharges *outside* the NPDES permit limits. Rec. vol. V at 459–60. According to defendant, the government did not establish materiality since its only evidence reflected the actual levels of pollutant as within permit limits and enforcement action would result only if the levels exceeded permit limits. As authority, he cites *United States v. Radetsky*, 535 F.2d 556 (10th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976).

*Radetsky* involved a Medicare fraud scheme whereby the defendant doctor at-

---

1. Section 1001 reads as follows:
  Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both. Although the statutory language separates oral from written statements, we have held that materiality is an essential element of the offense and applies to both oral and written statements. *See Gonzales v. United States*, 286 F.2d 118, 120–121 (10th Cir.1960), *cert. denied*, 365 U.S. 878, 81 S.Ct. 1028, 6 L.Ed.2d 190 (1961).

tempted to obtain reimbursement from the government for medicinal drugs that he did not prescribe. We held, as matter of law, that the government could not establish materiality under 18 U.S.C. § 1001 because the doctor's false reports were of drugs that were noncompensable under Medicare regulations. *Radetsky*, 535 F.2d at 572–74. The doctor's false reports therefore were incapable of influencing the government to reimburse.[2] Defendant contends that the circumstances of his case parallel those of *Radetsky* because the government's evidence, the laboratory technician's diary, reflected no need for EPA enforcement because it recorded the true levels of pollutants to be within NPDES permit limits. The record, however, reveals that defendant's reliance on *Radetsky* is misplaced.

Contrary to defendant's position, the lab technician's diary was not the only evidence the government produced as to the true levels of effluent. The record contains expert testimony to the effect that it was impossible for the treatment plant to meet its NPDES permit limitations during the indictment period, May 1985, to September 1986. Rec. vol. VII at 844. The government expert testified that he examined the plant in November 1986, and found it in a state of disrepair. When asked his opinion of the operation of the plant during the indictment period, the witness responded: "Well, they hadn't taken care of the plant. They hadn't ordered new parts and installed them when they were needed.... The place was just kind of a mess." *Id.* at 833. The expert testified in detail regarding the specific problems resulting from the plant's poor condition and why such problems rendered it impossible for the plant to meet its NPDES permit requirements during the indictment period. *Id.* 833–44. Furthermore, the laboratory technician's diary reflecting discharge levels within permit limits covered only two months of the indictment period. The expert testimony, on the other hand, considered the entire eighteen-month period. This expert testimony allowed the government to establish that defendant's false statements could have influenced an EPA enforcement decision. *See* 40 C.F.R. § 122.41(a) (1990) ("Any [NPDES] permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action....").

In *United States v. Wolf*, 645 F.2d 23 (10th Cir.1981), we noted that "[s]ection 1001 is basically a provision directed to statements to obtain federal funds or direct governmental benefits [but] is of course not so expressly limited...." *Id.* at 25. As the Supreme Court has recognized, the statute also has a role "in protecting the integrity of official inquiries." *Bryson v. United States*, 396 U.S. 64, 70, 90 S.Ct. 355, 359, 24 L.Ed.2d 264 (1969). *See also Wolf*, 645 F.2d at 26 ("[The falsified certificate] was required by the agency and was a basic part of the regulatory structure which depended on the accuracy and truth of such certificates."). The Ninth Circuit has noted that "[t]he NPDES program fundamentally relies on self-monitoring." *Sierra Club v. Union Oil Co.*, 813 F.2d 1480, 1491 (9th Cir.1987), *vacated and remanded on other grounds*, 485 U.S. 931, 108 S.Ct. 1102, 99 L.Ed.2d 264 (1988). The same court held that discharge monitoring reports showing exceedences were conclusive evidence of NPDES permit violations. *Id.* at 1492. Also, the legislative history of the Clean Water Act reveals that Congress sensed a need for accurate self-reporting:

> One purpose of these new requirements [self-reporting requirements] is to avoid the necessity of lengthy fact finding, investigations, and negotiations at the time of enforcement. Enforcement of violations of requirements under this Act should be based on relatively narrow fact situations requiring a minimum of discretionary decision making or delay.

2. Some of Dr. Radetsky's reports were of compensable drugs; however, those drugs were compensable only if the patient were diagnosed with certain diseases. 535 F.2d at 573. Because the doctor's requests for reimbursement were not coupled with reports of diagnoses of the required diseases, these false requests were also incapable of influencing the government to reimburse. *Id.*

7 S.Rep. No. 414, 92 Cong., 1st Sess. 64, *reprinted in* 1972 U.S.Code Cong. & Ad. News 3668, 3730. *See also, Union Oil*, 813 F.2d at 1492 (discussing S.Rep. No. 414).

Defendant's false statements served to undermine the integrity of the self-monitoring permit system. Our finding of materiality in this case, however, turns on the evidence that defendant's false statements had the tendency to influence or were capable of influencing an EPA enforcement action.

At the time of trial, March 1990, this circuit treated 18 U.S.C. § 1001 materiality as a question of fact. *See Daily*, 921 F.2d at 1004. The district court properly submitted the materiality determination to the jury; however, after trial, but before the case was orally argued to this court, our decision in *Daily* overruled prior Tenth Circuit precedent and held that § 1001 materiality is a legal issue. *Id.* at 1004–06. In accordance with *Daily*, we have reviewed the materiality determination de novo as a matter of law.

■ Because our treatment of materiality as a matter of law rather than fact entails an "attendant reduction of the government's burden of proof on [the] issue," *id.* at 1004 n. 9, we must address defendant's due process rights. The *ex post facto* clause is implicated when there is a " 'change[ ] [of] the rules of evidence by which less or different testimony is sufficient to convict than was ... required' " at the time of the crime. *United States v. Affleck*, 765 F.2d 944, 948 (10th Cir.1985) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325–26, 18 L.Ed. 356 (1866)). *See also Coleman v. Saffle*, 869 F.2d 1377 (10th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1835, 108 L.Ed.2d 964 (1990). The analysis in this case, although identical to an *ex post facto* analysis, falls under the rubric of due process because the change stems from the court rather than the legislature. *See Coleman*, 869 F.2d at 1385 (citing *Marks v. United States*, 430 U.S. 188, 191–92, 97 S.Ct. 990, 992–93, 51 L.Ed.2d 260 (1977)).

We find no due process violation in treating materiality as a question of law in this case because the change in the law does not disadvantage defendant. *See Coleman*, 869 F.2d at 1386 (for due process violation, change must " 'disadvantage[ ]' " defendant) (quoting *Weaver v. Graham*, 450 U.S. 24, 29–30 & n. 12, 101 S.Ct. 960, 964–65 & n. 12, 67 L.Ed.2d 17 (1981)). In treating materiality as a factual issue, as defendant urges, we examine the evidence in a light most favorable to the government to determine if the evidence was sufficient for submission to the jury. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Williams*, 923 F.2d 1397, 1402 (10th Cir. 1990). The government presented the jury with specific testimony regarding the possibility of enforcement and the poor condition of the plant. *See* Rec. vol. V at 459–60 (standard for enforcement); Rec. vol. VII at 833–44 (expert opinion regarding poor plant condition and inability to meet permit requirements). We think this was sufficient for " '*any* rational trier of fact' " to find materiality under § 1001 beyond a reasonable doubt. *Williams*, 923 F.2d at 1402 (quoting *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original)). Defendant therefore is not disadvantaged by our retroactive application of the *Daily* legal analysis because the materiality element would be deemed established to our satisfaction under either analysis. We hold, as a matter of law, that defendant's false statements were material under 18 U.S.C. § 1001.

## II.

Defendant's remaining arguments pertain to his convictions for discharging pollutants in violation 33 U.S.C. §§ 1311(a) & 1319(c). Before addressing defendant's arguments, we summarize the facts as follows. In 1984, the city of Enid obtained a renewed NPDES permit from the EPA to discharge pollutants from the city's wastewater treatment plant into nearby Boggy Creek. Rec. vol. V at 446–449. The original NPDES permit provided for two discharge point sources, outfalls 001 and 002; whereas the new permit allowed for only

one discharge point source, outfall 001. *Id.* at 448. Discharges from outfall 002, although expressly prohibited by the renewed NPDES permit, continued during times of heavy rain. Rec. vol. VI at 550–54. The discharges resulted from a thirty-six-inch bypass pipe which would divert raw sewage through outfall 002 when heavy rain caused excess water to flow through the sewage system. *Id.;* Rec. vol. VII at 822–23. The evidence reveals that the plant supervisor informed defendant, in defendant's capacity as public utilities director, that the plant was discharging raw sewage from outfall 002, Rec. vol. VI at 550–54, and that defendant physically observed two such discharges in January and August 1986. Rec. vol V at 311, 384–96. Moreover, the evidence reveals that defendant instructed the plant supervisor not to report the discharges to the EPA as required by the permit. Rec. vol. VI at 554. The jury convicted defendant on two counts pursuant to 33 U.S.C. §§ 1311(a) & 1319(c) for the January and August 1986 permit violations.

As stated above, § 1311(a) of the Clean Water Act prohibits "any person" from discharging "any pollutant" into the waters of the United States except as authorized by the EPA or an EPA authorized state agency. The EPA authorizes certain discharges pursuant to the NPDES permitting system. *See* § 1342. At the time of the indictment period, § 1319(c) provided for criminal sanctions for "any person" who "willfully or negligently" violated § 1311(a) or any NPDES permit.[3] This case involves

a "willful or negligent" violation of an NPDES permit.

Defendant claims: (1) he is not a "person" as contemplated by §§ 1319(c) & 1362(5) of the Clean Water Act; and (2) the government's evidence was insufficient to prove that he "willfully or negligently" discharged pollutants in violation of the city's NPDES permit. *See* § 1319(c).

### A.

Defendant's first argument calls for an interpretation of the Clean Water Act, a legal question. We therefore review de novo. *Oklahoma v. Environmental Protection Agency,* 908 F.2d 595, 599 (10th Cir.1990), *cert. granted,* —— U.S. ——, 111 S.Ct. 1412, 113 L.Ed.2d 465 (1991). Defendant contends that the city was the only "person" chargeable for a permit violation because the city was the permittee.

As with any question of statutory interpretation, we must begin with the language of the statutes. If the statutory language " 'is unambiguous and free of irrational result, that language controls.' " *United States v. Morgan,* 922 F.2d 1495, 1496–97 (10th Cir.1991) (quoting *Glenpool Util. Servs. Auth. v. Creek County Rural Water Dist.,* 861 F.2d 1211, 1214 (10th Cir. 1988), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989)). The plain language of the relevant statute includes "individuals" in the definition of "persons" subject to the Clean Water Act. *See* § 1362(5). Defendant certainly is an "indi-

---

**3.** At the time of the indictment, the Clean Water Act provided in part:

> 33 U.S.C. § 1311(a) Illegality of pollutant discharges except in compliance with law
> Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful.
> 33 U.S.C. § 1319(c) Criminal Penalties
> (1) Any person who willfully or negligently violates section 1311 ... of this title, or any permit condition or limitation implementing any of such sections in a permit issued under section 1342 [NPDES permit] of this title by the Administrator ... shall be punished....

> . . . . .
> (3) For the purposes of this subsection, the term "person" shall mean, in addition to the definition contained in section 1362(5) of this title, any responsible corporate officer.
> 33 U.S.C. § 1362 Definitions
> (5) The term "person" means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body.

In 1987, Congress amended § 1319(c) to eliminate the category of willful conduct. The amendment, however, is irrelevant to this appeal because defendant's conduct occurred prior to 1987 and defendant was prosecuted pursuant to the old statute.

vidual." Section 1311(a) prohibits "any person"—any "individual" according to § 1362(5)—from discharging pollutants except as in accordance with an NPDES permit or other specified provisions in the Act. Section 1319(c), at the time of the indictment, provided for criminal sanctions for "any person"—"any individual"—who "willfully or negligently" caused such a violation. Thus, it appears that defendant, as an "individual," is subject to criminal liability under the Act.

Defendant, however, contends that an "individual" is subject to § 1319(c)'s criminal sanctions for NPDES permit violations only if he is the permittee. As support for this interpretation, he points to § 1319(c)(3)'s addition of "responsible corporate officers" to the Act's general definition of "persons" as contained in § 1362(5).[4] He argues that § 1319(c)(3)'s addition of "responsible corporate officers" is meaningless if § 1362(5) already makes "persons" of "individuals" who merely are related to discharging permittees. Accordingly, he argues, he is not a "person" subject to criminal liability because the government did not prove that he was the permittee or a "responsible corporate officer" of the discharging permittee.

Section 1319(c)(3) does not define a "responsible corporate officer" and the legislative history is silent regarding Congress's intention in adding the term. The Supreme Court, however, first recognized the concept of "responsible corporate officer" in 1943. *See United States v. Dotterweich,* 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943). The *Dotterweich* Court held that a corporation's misdemeanor offense under the Federal Food, Drug, and Cosmetic Act of 1938 (FDCA) was committed by all corporate officers "who do have ... a responsible share in the furtherance of the transaction which the statute outlaws ... though consciousness of wrongdoing be totally wanting." *Id.* at 284, 64 S.Ct. at 138. *See also United States v. Park,* 421 U.S. 658, 670–73, 95 S.Ct. 1903, 1910–12, 44 L.Ed.2d 489 (1975); *United States v. Cattle King Packing Co.,* 793 F.2d 232, 240 (10th

Cir.), *cert. denied,* 479 U.S. 985, 107 S.Ct. 573, 93 L.Ed.2d 577 (1986); 21 U.S.C. § 333(a) (misdemeanor criminal responsibility under FDCA does not require "consciousness of wrongdoing"). The rationale for this harsh rule lay in the type of legislative action that the *Dotterweich* Court was interpreting. Congress passed the FDCA in order to protect the public health, and, according to the Court, Congress perceived the public health interest to outweigh the hardship suffered by criminally liable responsible corporate officers who had no consciousness of wrong-doing. *Dotterweich,* 320 U.S. at 284–85, 64 S.Ct. at 138. The same rationale applies to the Clean Water Act. Congress intended, with the Act, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters ... [and that] the discharge of pollutants into the navigable waters be eliminated by 1985." 33 U.S.C. § 1251(a). We think that Congress perceived this objective to outweigh hardships suffered by "responsible corporate officers" who are held criminally liable in spite of their lack of "consciousness of wrongdoing." We interpret the addition of "responsible corporate officers" as an expansion of liability under the Act rather than, as defendant would have it, an implicit limitation. The plain language of the statute, after all, states that "responsible corporate officers" are liable *"in addition to* the definition [of persons] contained in section 1362(5)...."* § 1319(c)(3) (emphasis supplied). Under this interpretation, a "responsible corporate officer," to be held criminally liable, would not have to "willfully or negligently" cause a permit violation. Instead, the willfulness or negligence of the actor would be imputed to him by virtue of his position of responsibility. This in no way limits other "persons," as defined by § 1362(5), to permittees. The statute plainly states that any "person," permittee or nonpermittee, who causes a permit violation through willful or negligent conduct, is subject to criminal sanctions. We hold that defendant, as an "individual," is a "person" subject to criminal liability under the Act.

**4.** *See supra* note 3.

**1420**

B.

■ In his final argument, defendant challenges the sufficiency of the government's evidence on the two illegal discharge counts. Defendant concedes that the government proved the illegal discharges which occurred in January and August 1986; however, he contends that the government did not present evidence linking the discharges to willful or negligent conduct on his part. Instead, he argues, he was convicted solely by virtue of his position as director of public utilities for the city of Enid.[5]

■ When reviewing the sufficiency of the evidence, our inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1970) (emphasis in original); *United States v. Williams*, 923 F.2d 1397, 1402 (10th Cir.1990). We believe that the government met its burden in this case. The record reveals that defendant had primary operational responsibility for the treatment plant, Rec. vol. V at 383, and that he physically observed both of the NPDES permit violations in question. *Id.* at 311, 384–96. Also, witnesses testified that defendant was informed that such illegal discharges were prone to occur during heavy rains and that he reviewed logs recording repeated illegal discharges. Rec. vol. V at 281–82, 303–04, 327–28, vol. VI 550–54. The plant supervisor testified that defendant repeatedly instructed him not to report the violations to the EPA as required by the NPDES permit. Rec. vol. VI at 551–58. The supervisor also testified that, when he informed defendant that these discharges were required to be reported to the EPA, defendant replied: "Don't worry about it." *Id.* at 555. It

appears from the plant supervisor's testimony that he discussed illegal discharges with defendant several times over a period of years and that the discharges were never reported. *Id.* at 551–558.

The city, according to its NPDES permit, was required to report these discharges. Rec. vol. V at 443–455. When the EPA later discovered the thirty-six-inch bypass pipe which allowed the discharges to occur, it ordered the city to plug the pipe. The city subsequently complied with the order and the illegal discharges via the bypass pipe ceased. Rec. vol. IV at 175. If defendant had complied with his duty as the operational manager of the plant to report the NPDES permit violations, the problem would have been abated long before the discharges in question. Instead, the evidence reveals that he willfully allowed the discharges to continue unabated and unreported. Contrary to defendant's argument, the jury considered more evidence than simply evidence of his position of responsibility. In this case the jury considered evidence of specific conduct which allowed the illegal discharges to occur. As the Third Circuit has noted, "[t]he Government [does] not have to present evidence of someone turning on a valve or diverting wastes in order to establish a willful violation of [1311(a) & 1319(c)]." *United States v. Frezzo Bros., Inc.*, 602 F.2d 1123, 1129 (3d Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). Viewing the evidence in a light most favorable to the government, we conclude that a rational jury could find defendant's conduct a willful and, at the very least, negligent causation of the illegal discharges.[6]

AFFIRMED.

BRORBY, Circuit Judge.

I concur and write separately to emphasize the narrowness of this decision.

The majority has stated:

---

5. Although defendant may have been subject to prosecution pursuant to § 1319(c) as a "responsible corporate officer" because of his position with the city of Enid, the jury was not presented with such a theory.

6. As an alternate theory of criminal liability, the government prosecuted defendant as an aider or abettor pursuant to 18 U.S.C. § 2. 18 U.S.C. § 2(a) provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

Our finding of materiality ... turns on the evidence that defendant's false statements had the tendency to influence or were capable of influencing an EPA enforcement action.

Majority op. at 1417. This statement is correct under the facts of this case; however, this statement should not be construed as holding that influencing "enforcement action" is the exclusive basis for finding materiality.

This Circuit long ago enunciated a clear and straightforward test of materiality. In *Gonzales v. United States*, 286 F.2d 118 (10th Cir.1960), we stated:

[I]n determining whether a false statement is material, the test is whether it "has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a determination required to be made."

*Id.* at 120.

As noted by the majority, the misstatements included in Brittain's falsified discharge monitoring reports were capable of influencing EPA enforcement decisions and were therefore material. Looking at the Clean Water Act and the applicable regulations, we find other examples showing that agency determinations may also depend on the accuracy of the information contained in the discharge monitoring reports, such as certain permit decision (40 CFR §§ 122.-41(a) and 122.62) and the establishment of pretreatment requirements (40 CFR Part 403). Even to the extent these determinations are not "enforcement" oriented, upon proper proof, they may provide a basis for a finding of materiality. Many fact patterns could be presented wherein a false statement could be capable of influencing required agency determination yet not be "enforcement" oriented.